IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAROLD SANFORD CARTER, III,** | : | CIVIL ACTION NO. 1:20-CV-1923 |
| **Plaintiff** | : | (Judge Conner) |
| v. | : | |
| **ULLI KLEMM, DARRELL WIREMAN, JILL J. SPYKER,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Plaintiff Harold Sanford Carter, III ("Carter"), commenced this action pursuant to 42 U.S.C. § 1983 alleging that defendants violated his constitutional right to practice his religion. (Doc. 1). Named as defendants are Ulli Klemm, Darrell Wireman, and Jill Spyker. Before the court is defendants' partial motion (Doc. 11) to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the court will grant the motion.

**I.     Factual Background & Procedural History**[1]

The allegations of the complaint stem from Carter's incarceration at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon").[2] (Doc. 1). He sets forth claims against Religious Services Administrator Reverend Ulli Klemm, former SCI-Huntingdon Facility Chaplaincy Program Director Darrell Wireman, and SCI-Huntingdon Deputy Superintendent for Centralized Services

---

[1] The factual recitation only includes the facts relevant to the instant motion.

[2] Carter is no longer incarcerated. (See Doc. 26).

Jill Spyker. (Id. at 2-3). Carter alleges that he was denied the right to practice his Wicca religion in violation of the First and Fourteenth Amendments, and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). (Id.)

First, Carter alleges that defendants violated his rights by prohibiting him from participating in Wiccan study groups. SCI-Huntingdon policy provides that a chaplain or outside volunteer must be present for a religious study group. (Id. at ¶ 15). Carter alleges that there are no Wiccan chaplains or Wiccan outside volunteers available at SCI-Huntingdon. (Id. at ¶¶ 16, 26). Carter submitted a religious accommodation request seeking a Wiccan study group. (Id. at ¶ 17). On May 22, 2018, Carter was informed that because there are no available outside volunteers, Wiccans could not hold a religious study group. (Id.) Carter contends that Buddhists, Muslims, and Native Americans conduct religious services at SCI-Huntingdon without a chaplain or outside volunteer. (Id. at ¶¶ 18, 20-21). On May 24, 2018, Carter submitted a grievance wherein he sought permission to hold a Wiccan study group without a chaplain or outside volunteer. (Id. at ¶ 23). On July 3, 2018, defendant Spyker denied the grievance and informed Carter that Buddhists and Native Americans were able to conduct study groups because they previously had oversight by outside volunteers. (Id. at ¶ 24). Defendant Spyker also advised Carter that he may practice his religion in his cell. (Id.) Carter appealed the grievance to final review. (Id. at ¶ 28). The Chief Grievance Officer ultimately informed Carter that religious groups may view, or listen to, approved DVDs, CDs, or videos in a group setting at their institution. (Id.)

Second, Carter alleges that defendants violated his rights by denying him access to various Wiccan foundational texts. The library at SCI-Huntingdon previously had Wiccan foundational texts available for inmates, but the books were removed by inmates and are no longer available. (Id. at ¶ 34). On March 30, 2018, Carter wrote to defendant Wireman and requested Wiccan foundational texts. (Id. at ¶ 30). In response, defendant Wireman informed Carter that he was working with the library to obtain the texts. (Id. at ¶¶ 31-32). Carter alleges that he never received the texts through the library. (Id. at ¶ 32). Carter then filed a grievance wherein he requested religious texts. (Id. at ¶ 30). The grievance was denied at all levels of review. (Id. at ¶ 33). Carter states that he purchased Wiccan foundational texts to practice his religion and donated five Wiccan books to SCI-Huntingdon. (Id. at ¶¶ 37, 38). Carter also alleges that defendants rejected incoming religious books that were mailed to him by his Wiccan church because the books were not from an original source. (Id. at ¶¶ 72-80).

Third, Carter alleges that defendants violated his rights by denying his request to obtain a quartz crystal and a Thor's hammer. Carter asserts that Wiccans use religious objects to practice their faith, including a quartz crystal and a Thor's hammer. (Id. at ¶¶ 9, 60, 66). On August 30, 2018, Carter submitted a religious accommodation request for a quartz crystal. (Id. at ¶ 58). On February 7, 2019, his request was denied, and Carter was advised that he may use rocks from the prison yard to practice his religion. (Id. at ¶¶ 59, 61). On January 22, 2020, Carter submitted a religious accommodation request seeking permission to possess a Thor's hammer. (Id. at ¶ 64). On April 6, 2020, his request was denied because a

3

Thor's hammer is considered a symbol used by Security Threat Groups, such as white supremacists and outlaw biker groups, and is a threat to institutional security. (Id. at ¶¶ 65, 67). Although Carter was denied the right to possess a Thor's hammer, he asserts that members of the Jewish faith are allowed to possess the Star of David. (Id. at ¶¶ 68-70).

Lastly, Carter alleges that defendants violated his rights by denying him access to Wiccan broadcast videos. On March 19, 2020, the Secretary of the Department of Corrections ("DOC") ordered that institutions may broadcast available instructional videos to religious groups that do not have a faith group leader. (Id. at ¶ 81). On June 2, 2020, Carter submitted a religious accommodation request to view Wiccan videos. (Id. at ¶ 83). Defendant Spkyer responded to the request and advised Carter to request religious literature or seek an approved faith group leader. (Id. at ¶¶ 84-86). Carter then filed a grievance requesting access to Wiccan religious videos, but the grievance was denied at all levels of review. (Id. at ¶¶ 85, 86).

Defendants move to partially dismiss the complaint on the grounds that (1) the complaint fails to allege defendants' personal involvement in the alleged wrongdoing; (2) the complaint fails to state a plausible claim for a violation of Carter's right to practice his religion under the First Amendment and RLUIPA; and (3) the complaint fails to state a plausible claim for relief under the equal protection

4

clause.³ (Docs. 11, 12).  Carter failed to respond to defendants' motion and the time for responding has now passed.⁴  Therefore, the motion is deemed unopposed and ripe for resolution.

## II.     Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)).  Although the court is generally limited in its review to the facts contained in the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

---

³ Defendants do not move to dismiss Carter's claim that defendants violated his right to freely express his religion, under the First Amendment and RLUIPA, by prohibiting him from participating in a yule feast. (Doc. 12 at 15, n. 2).  Nor do they move to dismiss Carter's claim that defendants violated the equal protection clause by prohibiting him from participating in a yule feast.  (Id. at 24, n. 7).

⁴ Carter was directed to file a brief in opposition to defendants' partial motion to dismiss and was admonished that failure to file an opposition brief would result in defendants' motion being deemed unopposed. (Docs. 18, 25 (citing M.D. PA. L.R. 7.6)).

5

Federal notice and pleading rules require the complaint to provide "the defendant notice of what the . . . claim is and the grounds upon which it rests." Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint in the face of a Rule 12(b)(6) motion, the court must conduct a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded. Id.; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the well-pleaded factual allegations have been isolated, the court must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

### III. Discussion

#### A. Constitutional Claims

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

### 1. *Lack of Personal Involvement*

Defendants seek dismissal of the claims against them based on a lack of personal involvement. (Doc. 12 at 12-15). Individual liability will be imposed under § 1983 only if the state actor played an "affirmative part" in the alleged misconduct. See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)). Liability "cannot be predicated solely on the operation of respondeat superior." Id. In other words, defendants in § 1983 civil rights actions "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence." Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003); Rode, 845 F.2d at 1207-08. Acquiescence requires both contemporaneous knowledge of the alleged wrongdoing and direct supervisory authority over the subordinate actor. Atkinson, 316 F.3d at 271; Rode, 845 F.2d at 1207-08. Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars

of conduct, time, place, and person responsible. Evancho, 423 F.3d at 354; Rode, 845 F.2d at 1207-08. When a plaintiff merely hypothesizes that an individual defendant may have had knowledge of or personal involvement in the deprivation of his or her rights, individual liability will not follow. Atkinson, 316 F.3d at 271; Rode, 845 F.2d at 1207-08.

In the complaint, Carter alleges that he wrote to defendant Wireman about obtaining Wiccan foundational texts. (Doc. 1 ¶ 30). Defendant Wireman allegedly responded that he was working in conjunction with the library to obtain the texts. (Id. at ¶¶ 31-32). Carter asserts that he never received the texts through the library. (Id. at ¶ 32). As presently drafted, the court finds that Carter has set forth sufficient allegations of personal involvement against defendant Wireman. Defendants' motion to dismiss the claims against defendant Wireman based on lack of personal involvement will be denied.

With respect to defendant Klemm, Carter fails to set forth any specific allegations against him. Aside from listing defendant Klemm as a defendant in the claim for relief, the complaint fails to allege any personal involvement of defendant Klemm or set forth any factual averments that identify how he was involved in the alleged wrongdoing. (See Doc. 1 at 20-24).

Next, it appears that Carter seeks to hold defendant Spyker liable based solely upon her responses to his grievances. (Doc. 1 ¶¶ 24, 83-84). The "failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional violation." Flanagan v. Shively, 783 F. Supp. 922, 931-32 (M.D. Pa. 1992), aff'd, 980 F.2d 722 (3d Cir. 1992). Thus, insofar as Carter's claims against

defendant Spyker are premised on her denial of inmate grievances, dissatisfaction with responses to an inmate's grievances does not support a constitutional claim. See Brooks v. Beard, 167 F. App'x. 923, 925 (3d Cir. 2006) (nonprecedential) (holding that allegations that prison officials responded inappropriately to an inmate's later-filed grievances do not establish the involvement of those officials and administrators in the underlying constitutional deprivation); Alexander v. Gennarini, 144 F. App'x 924 (3d Cir. 2005) (nonprecedential) (concluding that involvement in the post-incident grievance process is not a basis for liability).

Because Carter's complaint fails to provide any allegations of personal involvement against defendants Klemm and Spyker, the court will dismiss Carter's claims against these defendants.

### 2. *First Amendment Free Exercise of Religion*

Carter alleges that defendants violated his right to freely express his religion under the First Amendment by prohibiting him from participating in Wiccan study groups, denying him access to Wiccan foundational texts, denying him access to a quartz crystal and a Thor's hammer, and denying him access to Wiccan broadcast videos.

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. CONST. amend. I. It offers protection for a wide variety of expressive activities, which are lessened, but not extinguished, in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. Turner v. Safley, 482 U.S. 78, 89 (1987). Although prisoners must be afforded

9

"reasonable opportunities" to exercise the religious freedoms guaranteed by the First Amendment, see Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972) (*per curiam*), imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment right to the free exercise of religion. O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987). Only beliefs which are both sincerely held and religious in nature are entitled to constitutional protection. Wisconsin v. Yoder, 406 U.S. 205, 215-19 (1972); Dehart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000).

Once it is established that the individual has a belief that is "both sincerely held and religious in nature," the Turner test must be applied to determine whether the curtailment at issue is reasonably related to penological interests. DeHart, 227 F.3d at 51. Specifically, Turner instructs courts to weigh the following four factors in determining the reasonableness of a challenged prison regulation: (1) "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are "ready alternatives" available "that fully accommodate the prisoner's right at *de minimis* cost to valid penological interests." Turner, 482 U.S. at 89-91; O'Lone, 482 U.S. at 350-52.

The most important prong of the Turner analysis requires a rational connection between the policy and the legitimate governmental interest that justifies it. Nasir v. Morgan, 350 F.3d 366, 372 (3d Cir. 2003). "According to Turner,

a regulation will be sustained unless, 'the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.'" Id. (citing Turner, 482 U.S. at 89-90).

### a.     **Wiccan Study Groups**

Carter asserts that, pursuant to SCI-Huntingdon policy, a chaplain or outside volunteer must be present for a religious study group. (Doc. 1 ¶ 15). He alleges that because there are no Wiccan chaplains or Wiccan outside volunteers at SCI-Huntingdon, his right to practice his religion has been burdened. (Id. at ¶¶ 16, 26).

With respect to the first Turner factor, the DOC policy permitting inmates to worship as a group, if the services are conducted by a chaplain or outside volunteer, is rationally related to a legitimate government interest—prison safety and security. See Smith v. Kyler, 295 F. App'x 479, 481-82 (3d Cir. 2008) (nonprecedential) (holding that inmate's free exercise rights were not violated by DOC's policy to provide chaplains for only largest major faith groups and to prohibit group worship in absence of approved, volunteer faith group leader). The DOC policy for religious activities is set forth in Department of Corrections Administrative Directive 819 ("DC-ADM 819"). See DC-ADM 819, Religious Activities Policy, available at: https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/819%20Religious%20Activities.pdf (last accessed Aug. 18, 2021). Pursuant to DC-ADM 819, "[a]ll religious activities will be under the supervision of the Facility Chaplaincy Program Director, a Facility Chaplain, a Religious Contract Service Provider, or an approved designated corrections employee." DC-ADM 819, Section 1(B)(4). An inmate is

11

generally prohibited from leading religious services, except when approved in writing by the Facility Manager.  Id., Glossary of Terms, Inmate Peer Facilitator. Allowing an inmate to conduct a religious service without a chaplain or outside volunteer would essentially allow the inmate to exercise power or control over other inmates, which could jeopardize prison security.  Thus, defendants have satisfied their burden at the first step of the Turner analysis.

As to the second Turner factor, Carter acknowledges that he had alternative means of practicing his religion by praying in the privacy of his cell.  (Doc. 1 ¶¶ 13, 24).  Therefore, the second factor weighs in favor of defendants.

Carter failed to plead any facts related to the third and fourth Turner factors: there is no mention of the impact an accommodation for Carter would have on guards, other inmates, or allocation of prison resources; and there is no mention of the presence or absence of alternative policies or measures.

On the facts pled in Carter's complaint, we find that defendants have provided legitimate penological interests for their policy regarding religious study groups.  Carter has failed to respond to any of defendants' arguments, and the Turner factors weigh in favor of finding that the defendants' actions were reasonable.

### b. Wiccan Foundational Texts

Next, Carter alleges that defendants violated his rights by failing to provide religious texts through the prison library and that religious books mailed to him were rejected due to lack of compliance with DOC policy.  (Doc. 1 ¶¶ 30-32, 42, 72-74, 80).

12

With respect to the first <u>Turner</u> factor, the DOC policy regulating shipping of religious materials is rationally related to a legitimate government interest—reducing prison contraband.  DC-ADM 819 permits religious texts to be donated to the library by inmates and outside organizations provided they meet the standards of DC-ADM 803, "Inmate Mail and Incoming Publications."  <u>See</u> DC-ADM 819, Section 1(B)(7).  DC-ADM 803 allows inmates to order publications or receive donated publications if they are received from their original source.  <u>See</u> DC-ADM 803, available at: https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/803%20Inmate%20Mail%20and%20Incoming%20Publications.pdf (last accessed Aug. 18, 2021).  Carter avers that defendants, in accordance with DOC mail policies providing for monitoring of ingoing and outgoing mail, rejected incoming religious materials.  (Doc. 1 ¶¶ 72-80).  Carter admits that the incoming religious books were rejected because they were not from an original source, as required by DC-ADM 803.  (<u>Id.</u> at ¶ 77).  The court finds that the first factor favors defendants.

As to the second <u>Turner</u> factor, Carter concedes that he had alternative means of practicing his religion.  Carter was able to purchase Wiccan foundational tests and therefore had access to works relating to his religion while incarcerated.  (<u>Id.</u> at ¶¶ 37-38).  Therefore, the second factor weighs in favor of defendants.

The third and fourth <u>Turner</u> factors focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources, and the presence or absence of alternative policies or measures.  Carter has again failed to plead any facts related to these factors.

13

The court finds, based on the facts in Carter's current complaint, that the DOC policy of only accepting religious publications from their original source is rationally related to the legitimate government interest of reducing contraband within the prison system. The <u>Turner</u> factors weigh in favor of defendants, and the motion will be granted as to this free exercise of religion claim.

### c. Possession of Quartz Crystal and Thor's Hammer

Carter next alleges that defendants violated his rights by denying his request to obtain a quartz crystal and a Thor's hammer. (Doc. 1 ¶¶ 58-71).

Regarding the first <u>Turner</u> factor, the DOC policy regarding the possession of religious items is rationally related to a legitimate government interest—prison safety and security. Carter submitted a religious accommodation request seeking permission to possess a quartz crystal. (<u>Id.</u> at ¶ 58). His request was denied, and he was advised to use rocks from the prison yard as an alternative. (<u>Id.</u> at ¶¶ 59, 61). Carter also submitted a religious accommodation request seeking permission to possess a Thor's hammer. (<u>Id.</u> at ¶ 64). His request was denied because a Thor's hammer is considered a symbol used by Security Threat Groups and is a threat to institutional security. (<u>Id.</u> at ¶¶ 65, 67). DC-ADM 819 specifically prohibits the possession of "any religious symbols associated with a Security Threat Group." DC-ADM 819, Section 3(A)(1)(t)(1)(d). Safety and security concerns are legitimate penological reasons to deny Carter's request for these religious items. See, e.g., <u>Dunn v. Sec'y Pa. Dep't of Corr.</u>, 490 F. App'x 429, 431-32 (3d Cir. 2012) (nonprecedential) (holding that the institution's denial of crystals was reasonably

14

related to legitimate penological interests). The first <u>Turner</u> factor weighs in favor of defendants.

As to the second <u>Turner</u> factor, Carter admits that he had alternative means of practicing his religion. Carter is able to pray and conduct religious rituals in his cell. (Doc. 1 ¶ 61). Therefore, the second <u>Turner</u> factor weighs in favor of defendants.

With respect to the third and fourth <u>Turner</u> factors, Carter has failed to plead any facts related to these factors.

Defendants have provided legitimate penological interests for their policy regarding the possession of religious items. The court finds that, with respect to the possession of a quartz crystal and Thor's hammer in Carter's cell, deference must be afforded to prison personnel in establishing the necessary regulations and procedures to maintain the order, security, and discipline within the institution. As a result, based on the facts currently pled by Carter, the <u>Turner</u> factors weigh in favor of defendants and the court will grant defendants' motion with respect to Carter's claim regarding possession of a quartz crystal and Thor's hammer.

### d. **Wiccan Broadcast Videos**

Carter asserts that his freedom of religion under the First Amendment was violated based on his inability to view Wiccan broadcast videos. (Doc. 1 ¶¶ 81-87). He alleges that, during the COVID-19 pandemic, DOC institutions were permitted to broadcast available instructional videos to religious groups that did not have a faith group leader. (<u>Id.</u> at ¶¶ 81, 87). In response to this directive, Carter wrote to defendant Spyker and inquired about the availability of Wiccan videos. (<u>Id.</u> at ¶ 83).

15

Defendant Spyker informed Carter that he may request religious literature and seek an approved faith group leader. (Id. at ¶¶ 84-86). Defendants assert that Carter admits that institutions were permitted to broadcast only the *available* instructional videos to religious groups that did not have a faith group leader. (Doc. 12 at 23). They explain that Carter is able to worship in the privacy of his cell, he may request religious literature, and seek an approved faith group leader. (Id.) Again, Carter has failed to respond in any way to defendants' arguments. The facts as pled, even construed liberally, are not sufficient to show a violation of the First Amendment right to practice religion based on the unavailability of Wiccan broadcast videos. Therefore, the court will dismiss this First Amendment claim.

### 3. *Fourteenth Amendment Equal Protection Claim*

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Thus, to state a claim under the Equal Protection Clause, a plaintiff must allege that (1) he is a member of a protected class and (2) he was treated differently from similarly situated inmates. See id. Generally, prison officials cannot discriminate against inmates of different religions. Cruz, 405 U.S. 319. When an inmate asserts an equal protection claim based on the allegedly disparate treatment of different religious groups, the governing standard is whether the disparate treatment is "'reasonably related to legitimate penological interests.'" DeHart, 227 F.3d at 61. To state a claim, Carter must show that he was similarly situated to, and treated

16

differently than, other inmates requesting separate religious services, and such disparate treatment was not reasonably related to legitimate penological interests. City of Cleburne, 473 U.S. at 439.

DC-ADM 819 provides that any inmate with concerns regarding accommodations of any particular faith group must follow the procedures set forth in that policy, which include completing a religious accommodation request form. See DC-ADM 819, Section 4.  In the complaint, Carter acknowledges that his religious accommodation requests were denied based on threats to institutional security and failure to comply with the applicable DOC policies.  (Doc. 1 ¶¶ 15, 17, 65, 67, 77).  The requests and reviews were conducted in accordance with DC-ADM 819 and Carter does not allege that his reviews deviated from that applied to other inmates seeking the same religious accommodations.  Carter's affiliation with a particular faith group was not the reason for the denial of his requests.  Rather, the denials were based on safety and security concerns.  Therefore, the court will dismiss the equal protection claim.

**B.  RLUIPA Claims**

Carter alleges that defendants violated his right to freely express his religion under RLUIPA by prohibiting him from participating in Wiccan study groups, denying him access to Wiccan foundational texts, denying him access to a quartz crystal and a Thor's hammer, and denying him access to Wiccan broadcast videos.

Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to

17

an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); see also Cutter v. Wilkinson, 544 U.S. 709, 715 (2005). Although Congress intended that RLUIPA be construed "in favor of broad protection of religious exercise," see 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" Cutter, 544 U.S. at 723. Congress indicated that in the event an inmate's request for religious accommodation would "become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." Id. at 726.

The initial burden falls on Carter to demonstrate that the policies at SCI-Huntingdon have substantially burdened the practice of his religion. For the reasons set forth above, the allegations of the complaint fail to establish that any of the policies substantially burdened Carter's religion. Carter does not allege that defendants have deprived him of a benefit as a consequence of his religious belief. Accordingly, we will grant defendants' motion to dismiss the claims under RLUIPA.

18

### C.   Injunctive and Declaratory Relief

To the extent that Carter seeks declaratory or injunctive relief, whether in the context of the First or Fourteenth Amendments, or RLUIPA, his claims are moot because he is no longer incarcerated at SCI-Huntingdon.  Article III of the Constitution provides that the judicial power of the United States shall extend to "cases" and "controversies." U.S. CONST. art. III, § 2.  "[F]ederal courts may adjudicate only actual, ongoing cases or controversies," Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990), and "[i]t is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed,'" United States v. Juvenile Male, 564 U.S. 932, 936 (2011) (citation omitted).  Generally, an inmate's transfer from the facility complained of moots claims for equitable and declaratory relief.  Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003); Johnson v. Wenerowicz, 440 F. App'x 60, 62 (3d Cir. 2011) (nonprecedential) (holding that the prisoner's request for injunctive and declaratory relief against the named defendants was rendered moot by his transfer to another prison).  Because Carter is no longer incarcerated at SCI-Huntingdon, he does not present a live case or controversy for injunctive or declaratory relief regarding the policies or practices at that facility.

### IV.   Leave to Amend

When a complaint fails to present a *prima facie* case of liability, district courts must generally grant leave to amend before dismissing the complaint.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000).  Specifically, the Third Circuit Court of Appeals has

admonished that when a complaint is subject to dismissal for failure to state a claim, courts should liberally grant leave to amend "unless such an amendment would be inequitable or futile." Phillips, 515 F.3d at 245 (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)).  The defects in Carter's pleading are substantial, but they are factual in nature and thus conceivably could be cured by an amended pleading.  We will thus dismiss the deficient claims in Carter's complaint with leave to amend.

**V.**     **Conclusion**

We will grant defendants' partial motion (Doc. 11) to dismiss.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:          August 25, 2021